Reuben SETLIFF, M.D.,
Plaintiff/Appellant,

v.

MEMORIAL HOSPITAL OF SHERIDAN COUNTY, John Owen Yale, Barry Wohl, W.G. Saunders, and John Does 1 through 10, Defendants/Appellees,

and

D. Scott Nickerson and William Williams, Defendants.

No. 85–2819.

United States Court of Appeals,
Tenth Circuit.

July 1, 1988.

Patrick E. Hacker, Cheyenne, Wyo., for plaintiff/appellant Reuben Setliff, M.D.

Peter K. Michael, Lathrop & Uchner, Cheyenne, Wyo., Carl L. Lathrop, Lathrop & Uchner, Cheyenne, Wyo., with him on the briefs, for defendants/appellees Memorial Hosp. of Sheridan County, Yale, Wohl, and Saunders.

James L. Appelgate, Thomas G. Gorman and Glenn Parker, Hirst & Appelgate, Cheyenne, Wyo. with him on the briefs, for defendant/appellee Wohl.

W. Thomas Sullins, II, Brown & Drew, Casper, Wyo., on the briefs, for Saunders, for defendants/appellees Memorial Hosp. of Sheridan County, Yale, Wohl, and Saunders.

Before MOORE and ANDERSON, Circuit Judges, and PHILLIPS,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

This case arises out of an investigation conducted by the executive committee of defendant Memorial Hospital of Sheridan County ("Sheridan Hospital") with respect to the medical practice of plaintiff/appellant Dr. Reuben Setliff. Setliff filed suit against Sheridan Hospital, a government institution, the Hospital's administrator, certain individual doctors and John Does 1 through 10, alleging that the *investigation* (his privileges were not terminated) violated his First and Fourteenth Amendment rights because it was in retaliation for statements he had made, was punishment for his personality and philosophy, and because it effectively denied him, without due process, his property right in his hospital privileges and his liberty interest in the practice of his profession. The United States District Court for the District of Wyoming granted defendants' motions for summary judgment and dismissed Setliff's pendent state law claims alleging negligence, malicious prosecution, abuse of process and defamation. Setliff appeals and we affirm the grant of summary judgment to defendants and the dismissal of his claims.

## BACKGROUND

Setliff is an otolaryngologist (a doctor specializing in ear, nose and throat problems) with staff privileges at Sheridan Hospital. Sheridan Hospital is a governmental entity created and controlled by Sheridan County.

The investigation of Setliff's medical practice, which is the genesis of this lawsuit, was prompted by a complaint from Dr. D. Scott Nickerson at the regularly scheduled meeting on May 17, 1983 of the executive committee of Sheridan Hospital ("1983 Executive Committee").[1] Nickerson's complaint concerned Setliff's treatment of his (Nickerson's) son. The 1983

---

* Hon. Layn R. Phillips, U.S. District Court, Western District of Oklahoma, sitting by designation.

1. Pursuant to Article VI of the By-Laws, Rules and Regulations of Sheridan Hospital, the duties of the Executive Committee include the investigation of "any breech [sic] of ethics that may be reported," the review of "all information available regarding the competence of staff members," and the making of any "recommendation as to granting of privileges and re-appoint-ments." R. Vol. I, Doc. 54; *see also* Article III, Section 4 of the Medical Staff By-laws ("The Medical Executive Committee (credentials committee) may from time to time recommend to the Governing Body [the Board of Trustees] that a change in staff category or department assignment of a current staff member or the granting of additional privileges or deletion of existing privileges be approved."). R. Vol. I, Doc. 54.

Executive Committee, consisting of seven doctors, including defendant Dr. W.G. Saunders, and chaired by Dr. David Townes, "unanimously elected to take specific actions to review ... [Setliff's] medical practice within this hospital," Ex. 1 to Townes Affidavit, R. Vol. I, Doc. 54, because of the Nickerson complaint and because other members of the Executive Committee raised similar complaints about Setliff.[2] The 1983 Executive Committee selected June 1, 1983 for a special meeting to determine how to proceed with the investigation and Townes wrote a letter to Setliff inviting him to attend the June 1 meeting. Setliff responded with a letter dated June 1, in which he stated, in part:

"It should come as no surprise that such a review, whether fruitful or not, carries inherent risk of damaging me professionally and/or personally.

. . . .

"I have been advised and my position is that I cannot and should not attend a meeting simply to be informed that major decisions have been made based on unknown specifics from unknown sources and concerning which I am allowed neither information nor courtesy of response.

"I will, however, be most pleased to attend any meeting called for the purpose of discussing any and all aspects of my hospital practice provided that I have the courtesy of receiving specific information as to what will be discussed and that I receive assurance that I will be allowed an informed response."

Townes Affidavit, R. Vol. I, Doc. 54 Ex. 2. By letter dated June 20, 1983, the 1983 Executive Committee informed Setliff of the following resolution passed by the Committee at the June 1 meeting:

"In regard to Dr. Reuben Setliff, based on an accumulated series of questions, complaints, and disruptions over the eight years of Dr. Setliff's appointment

to this hospital staff, the Executive Committee deems it appropriate to exam [sic] Dr. Setliff's hospital practice.

"That examination shall include, but not be limited to:

"1. An examination of appropriateness of medical and surgical care, with the assistance of qualified external reviewers.

"2. An examination of Dr. Setliff's compliance with the Hospital Bylaws, Rules and Regulations (which he has agreed to abide by) to be conducted by a local committee."

Townes Affidavit, R. Vol. I, Doc. 54 Ex. 3. The letter invited Setliff to meet with the Committee. Townes' Affidavit and deposition state that the Committee invited Setliff on at least three occasions to appear before the Committee to discuss the investigation and he declined to appear. Townes Affidavit, R. Vol. I, Doc. 54; Deposition of Townes, R. Vol. II, Doc. 75 Ex. 2. Setliff explains his failure to appear by alleging that he "volunteered to attend any meeting 'called for the purpose of discussing any and all aspects of my hospital practice providing that I have the courtesy of receiving assurances that I will be allowed an informed response.'" Complaint ¶ 12, R. Vol. I, Doc. 1.

The Executive Committee conducted its investigation from early September 1983 until November 1983. It never met with Setliff. It also never investigated the specific complaints made by Dickerson or other Committee members, which prompted the investigation of Setliff. The Committee then determined that the "qualified external reviewers" specified in the June 1 resolution should be otolaryngologists, and it informed the governing body of Sheridan Hospital, the Board of Trustees, of the existence of the investigation and obtained authorization from the Board to pay for the services of three otolaryngologists. Apparently because of scheduling conflicts,

---

**2.** In addition to the specific complaints raised by Nickerson and others, the record reveals that Setliff had a history, which he does not seriously deny, of having his privileges suspended for failure to timely complete his medical records.

*See generally* Campbell Hospital Preliminary Hearing Regarding Courtesy Privileges of Dr. Reuben C. Setliff, III at 16–30, R. Vol. II, Doc. 75 Ex. 1; Deposition of Townes, R. Vol. II, Doc. 75 Ex. 2.

the three independent reviewers were unable to set a meeting to review Setliff's charts until April 28, 1984.[3] That meeting was canceled because of a major snowstorm. One of the outside reviewers, who was unable to reschedule a meeting, then had to be replaced by Dr. Raymond Woods, a professor at the University of Colorado Medical Center. The reviewers finally met, interviewed Setliff and reviewed medical charts concerning three surgical procedures performed by Setliff—suspension laryngoscopy, microantrostomy, and tympanoplasty.[4] They issued their report on July 10, 1984.

The reviewers identified a number of problems with Setliff's practice. With regard to suspension laryngoscopy, the reviewers found no fault with Setliff's actual performance of the procedure. They did, however, state that, in general, the time between performance of the surgery and dictation of the "operative note" was too long. The reviewers also found:

"Review of the histories and physicians [sic] on these patients show that the description of the Present Illness was sometimes very brief and inadequate. The history and physical examination reports ... were very stereotyped.... Postoperative notes and progress notes were poor, very difficult to read, and very sketchy. On many patients there were no postoperative notes written at all.... On [two] patients, [with carcinoma of the larynx] the description of the tumor was not felt to be adequate. These patients had major surgery on the larynx and there were very sketchy progress notes in the postoperative period on these patients. There was no men-

tion in the chart of any Staging on these patients done preoperatively."

Ex. 4 to Townes Affidavit, R. Vol. I, Doc. 54. With regard to Setliff's performance of microantrostomy, the reviewers expressed concern over the number of times Setliff performed this procedure on young children.[5] The reviewers also questioned Setliff's performance of multiple procedures on the same patient, stating that it would be "unusual" to find a patient requiring the performance of several procedures at one time. The reviewers found no significant problem with Setliff's performance of the third procedure under scrutiny, tympanoplasty.

Finally, from a "general review of other charts, as well as the hospital record on Dr. Setliff" the reviewers expressed the following concerns:

"There were many many complaints of late record completion, late dictation or delayed dictation of surgeries. On many of the charts there appeared to be inadequate progress notes in the postoperative period or no progress notes at all. The histories and physicals were very brief and there appeared to be a great deal of similarity between all the patients. There were complaints of the patient not being seen in the hospital before surgery, and the patient not being seen in the hospital after surgery. There were reports of abuse of hospital personnel, particularly in surgery. There were complaints of Dr. Setliff being late to surgery many times by an hour or more, or that he would leave the surgical suite for long periods of time and come back without having told the operating room personnel where he was going or giving an estimate of the time of his return.

---

3. The three reviewers were from Cheyenne, Wyoming, from Butte, Montana, and from the University of Michigan.

4. According to defendants' brief, suspension laryngoscopy involves the use of a laryngoscope (an instrument with lenses and a lighting system to permit inspection of the larynx) in such a way as to permit surgery on the larynx with both hands free. Brief of the Memorial Hospital of Sheridan County, John Owen Yale, Barry Wohl and W.G. Saunders, Appellees at 9 n. 1. Antrostomy is defined as "[t]he surgical forma-

tion of a permanent opening in a sinus or antrum, for drainage" and tympanoplasty is defined as a "surgical operation on the structures in the middle ear." *Id.* at nn. 2 & 3 (quoting 1 J.E. Schmidt, *Attorney's Dictionary of Medicine,* at A–271 and T–169 (1986)).

5. While Setliff had performed thirty such procedures in one year, none of the three reviewers had ever performed more than one or two in a year.

"These things are not consistent with the best medical care of patients."

*Id.* One of the reviewers sent to Townes a supplemental letter stating in part:

"I am unable to find anyone in the Denver community who performs any operation remotely resembling the microantroantrostomy procedure which Dr. Setliff is performing on children. The volume of procedures, at least the number which I quickly reviewed, of Dr. Setliffs' [sic] approximately 30 such operations in one year's time, far exceeds the total number of sinus procedures performed either at the Children's Hospital in Denver and my own experience which includes patients from both the University Hospital in Denver and the National Jewish Hospital for which I am the sole Otolaryngology consultant. The incidence of proven sinus disease amongst our patients at the National Jewish Hospital is without a doubt the largest of any medical center in the Denver area. *There is absolutely no question in my mind that the performance of this procedure based upon Rhinorrhea in children is unwarranted and unsupported by any of the records of Dr. Setliffs' [sic] which I reviewed.*

"Secondly, I am unable to find any support amongst those who do primarily Otologic surgery for immediate or shortinterim tympanoplasty in the repair of acute traumatic perforations of the tympanic membrane.... *The practice of performing a formal tympanoplasty of any type in the acute management of these injuries would strongly suggest an interest in performing a more complicated and consequently far more remunerative procedure than is justified by the nature of the injury.*"

Ex. 5 to Townes Affidavit, R. Vol. I, Doc. 54. (emphasis added).

Meanwhile, the 1983 Executive Committee had been superseded at the beginning of 1984 by a new Executive Committee ("1984 Executive Committee"). The members of the 1983 Executive Committee continued the investigation of Setliff as an "ad hoc" committee and ultimately transmitted a report to the 1984 Executive Committee on October 4, 1984. It made no specific recommendations. The 1984 Committee finalized its written recommendations on December 11, 1984 and transmitted them to the Board of Trustees of Sheridan Hospital and Setliff on January 3, 1985. The 1984 Committee recommended that a special committee review Setliff's records every three months and if, after a year, the committee was satisfied that Setliff's record-keeping and patient care were satisfactory, the committee would disband. The 1984 Committee also recommended that Setliff obtain second opinions before performing tympanoplasties, microantrostomies and multiple procedures.

The Board of Trustees interviewed Setliff on January 29, 1985 to enable him to respond to the 1984 Committee's recommendations. Setliff requested and was granted a "contested hearing" before the Board.[6] The contested hearing was held from July 16 to July 20, 1985. On September 23, 1985 the Board of Trustees issued its decision. It rejected the 1984 Committee's recommendations for a special review committee and second opinions prior to tympanoplasties, but it did require Setliff to obtain a second opinion prior to performing microantrostomies on children under twelve.

During the time that the investigation was underway, Setliff had an application pending for medical privileges at Campbell County Memorial Hospital in Gillette, Wyoming ("Campbell Hospital"). He had initially filed the application in October 1982. As a part of his application to Campbell

6. The Board considered the hearing to be a "contested case" as defined in Wyo.Stat. § 16–3–101(b)(ii) ("a proceeding including but not restricted to ratemaking, price fixing and licensing, in which legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for hearing.") The Board further "found that full discovery and development of the facts and issues regarding the allegations should be allowed by Dr. Setliff and by the Medical Staff Executive Committee pursuant to the provisions of the Wyoming Administrative Procedure Act and Wyoming Rules of Civil Procedure." Record of Findings of Interview Afforded Reuben C. Setliff, M.D., R. Vol. I, Doc. 54.

Hospital, Setliff executed a release from liability for any person furnishing information in connection with Setliff's application. R. Vol. I, Doc. 54.

In the fall of 1982, after receiving Setliff's application, Dr. Timothy Hobson, a doctor affiliated with Campbell Hospital, asked defendants Saunders and Wohl to comment on Setliff's qualifications. Saunders' affidavit in support of his motion for summary judgment concedes that Saunders said Setliff "behaved like a sociopath," and that his statements to Hobson occurred no later than November 12, 1982. Affidavit of Saunders, R. Vol. I, Doc. 54. Wohl's affidavit in support of his motion for summary judgment simply states that he expressed his "views to Dr. Hobson concerning Dr. Setliff's abilities as a physician" during the fall of 1982. Affidavit of Wohl, R. Vol. I, Doc. 54. Setliff's complaint alleged that Wohl, "with malice in bad faith" made various "false and unfounded assertions." Complaint ¶ 19, R. Vol. I, Doc. 1.[7]

Pursuant to a request from Campbell Hospital, Setliff transferred his Sheridan Hospital personnel file to Campbell Hospital. Setliff alleges that defendant Jack Yale, the administrator of Sheridan Hospital:

"Without the knowledge of the Plaintiff, ... included within the personnel file letters of complaint and negative materials which Plaintiff had never seen and which would normally not be included within those files. The Plaintiff was never afforded any notice or opportunity to respond to the information contained within the file, but rather it was included within the file and specifically numbered by Defendant in such a fashion as to insure that all of the negative information would be transmitted. Defendant Jack Yale in responding to inquiry from Campbell County Memorial Hospital wrote a letter specifically including negative information and excluding any positive comment or information pertaining to Plaintiff."

*Id.* ¶ 24.

Setliff's request for privileges at Campbell Hospital was denied by the Campbell Hospital Credentials Committee, as well as, on appeal, by the Hospital's Judicial Review Committee.[8] In so denying Setliff's application, the Judicial Review Committee stated:

"Any doctor applying for medical staff privileges whether courtesy privileges or regular staff privileges has the burden of proving his professional competence. The uncontroverted evidence before this committee is that *there is currently ongoing at the Sheridan Memorial Hospital a review process of Dr. Setliff's entire practice initiated by the executive committee* of the medical staff of Memorial Hospital of Sheridan County. This committee recognizes that *it is an unusual procedure for the medical staff executive committee of any hospital to review all medical cases of a physician, and this committee can only infer from the fact that such an inquiry is undergoing, the executive committee of Memorial Hospital of Sheridan County has reason to suspect the medical competency of the physician in question.* It is the opinion of this committee that it is not this committee's burden to demonstrate what may or may not be going on at the Memorial Hospital in Sheridan County concerning this review process, but rather it is Dr. Setliff's burden to explain this staff review in the process of seeking to obtain courtesy privileges at Campbell County Memorial Hospital."

7. Defendant Dr. William Williams also allegedly told Hobson that Setliff was a "sociopath" and "made false allegations alluding to improper professional conduct on the part of the Plaintiff." Complaint, ¶ 21, R. Vol. I, Doc. 1. Defendant D. Scott Nickerson allegedly "made false and misleading statements regarding Plaintiffs [sic] treatment in regard to his son." *Id.* at ¶ 22. Pursuant to a stipulation of the parties, Williams and Nickerson are not parties to this appeal.

8. Setliff had a hearing before the Campbell Hospital Judicial Review Committee on September 13, 1983, at which the investigation at Sheridan Hospital was discussed, as well as Setliff's history of poor medical record-keeping and chronic tardiness. *See* R. Vol. II, Doc. 75 Ex. 1.

*Id.* ¶ 25 (emphasis added). Ultimately, Setliff was granted limited privileges at Campbell Hospital.

Setliff's complaint in this case, filed on December 21, 1984, alleged four causes of action. Setliff's first claim, pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment, alleged that Sheridan Hospital, Saunders and Yale, acting under color of state law, deprived him without due process of his "property right in his hospital privileges," and of his "liberty right in his ability to practice his profession and in his good name, reputation and professional standing." *Id.* ¶ 34.[9] He further alleged that his "actions in advocating changes and improvements within Memorial Hospital of Sheridan County including disagreement over the quality of medical care and requests for changes in order to provide proper medical care constituted speech protected by the First and Fourteenth Amendment." *Id.* ¶ 35. Setliff also asserted "a constitutionally protected right to his own personality and philosophy" and that the investigation of his medical practice was "done in retaliation for Plaintiff's exercise of free speech and as punishment for his personality and philosophy."[10] *Id.* ¶¶ 36, 37. Setliff sought $8,000,000 in damages for "loss of income, and damage to present and future professional reputation and emotional suffering," $750,000 in punitive damages, and attorneys fees and costs.

His second, third and fourth claims invoked the district court's "ancillary and pendant jurisdiction." His second claim, against Sheridan Hospital, Yale and Saunders, alleged negligence in the conduct of the investigation and "the perversion of the peer review system into a mechanism for the harassment of Plaintiff." *Id.* ¶ 47. Setliff's third claim alleged that "[d]efendants Saunders and Wohl acting in cooperation with Defendant Does 1–5 have deliberately and willfully abused and perverted the peer review system created by the bylaws of Sheridan County Memorial Hospital." *Id.* ¶ 51. His fourth claim, against Saunders, Wohl, Williams, Nickerson, and John Does 6–10, alleged that each defendant had made "false and defamatory statements" concerning Setliff's professional ability. Under his second, third and fourth claims he sought damages for "loss of present and future earnings, damages to professional reputation and emotional suffering" in the amount of $8,000,000 for each claim, and he sought punitive damages of $750,000 under his third and fourth claims.

After several months of discovery, defendants Wohl, Saunders, Yale and Sheridan Hospital filed a motion for summary judgment, with affidavits from Yale, Saunders, Wohl, Townes, and Michael Davis, the attorney who represented the 1984 Executive Committee in the hearing before the Board of Trustees, as well as copies of

9. He also asserted in his complaint that "[t]he decision by the executive committee of Sheridan County Memorial Hospital to conduct such an investigation impaired Plaintiff's property right in the ability to practice his chosen profession and imposed a stigma which would foreclose his opportunity to practice his profession." Complaint ¶ 26, R. Vol. I, Doc. 1. In his affidavit filed in opposition to defendants' motion for summary judgment, Setliff asserted that he is required to disclose the existence of any investigation when he applies for "licensing, ... medical privileges ... [or] to medical societies." Affidavit of Setliff, R. Vol. I, Doc. 74. That disclosure has, he asserts, damaged his reputation and made it difficult for him to obtain new employment. He further states as follows:

"During the time the 'investigation' was occurring I suffered financially, personally and professionally. Patients asked me what was going on at the hospital. My banker, Joe Lyman, at First Wyoming Bank asked me

during the course of a conversation about a loan whether I was going to lose my hospital privileges.... I lost opportunities in several states because of the investigation. Because of the drop in medical income, other business ventures did not have capital. I was forced to file a Chapter 11 Bankruptcy."

*Id.* In his supplemental affidavit, he alleged that "[a] medical group in Elko, Nevada which was otherwise interested in me declined to discuss the matter further due to the investigation. I was informed by hospital representatives in Elkins, West Virginia, and Poplar Bluffs, Missouri that I would not be able to obtain medical privileges due to the Executive Committee's decision." Supplementary Affidavit of Setliff, R. Vol. II, Doc. 75.

10. Setliff's complaint also alleged a denial of equal protection, but he does not pursue that issue on appeal.

relevant documents and letters. Wohl submitted a supplemental memorandum in support of the motion. Setliff filed an opposing memorandum with his own affidavits and copies of the proceedings before the Judicial Review Committee of Campbell Hospital, Townes' deposition, the Sheridan Hospital By–Laws, Rules and Regulations, the Campbell Hospital decision regarding Setliff's application for staff privileges, and excerpts from the deposition of one of the outside reviewers.

The district court granted the motion for summary judgment on Setliff's first claim on the ground that Setliff failed to establish a "recognizable property or liberty interest" R. Vol. II, Doc. 80 at 4. The court did not specifically mention Setliff's First Amendment claim. The district court dismissed without prejudice his second and third claims, alleging negligence and abuse of process under state law, on the basis that it lacked jurisdiction over such pendent state law claims once the federal claims had been dismissed. It similarly dismissed without prejudice Setliff's state law defamation claims against Williams and Nickerson because they were not named in the first three claims and the court "may not exercise pendent jurisdiction over parties against whom the Court has no independent basis of federal jurisdiction." *Id.* at 5. Finally, the district court dismissed with prejudice the defamation claims against Saunders and Wohl on the ground that the Wyoming one year statute of limitations applicable to actions for libel or slander barred Setliff's action brought more than one year after Setliff learned of the allegedly defamatory statements.

On appeal, Setliff contends that the district court erred in granting summary judgment on his claim that defendants' actions were in retaliation for his exercise of his First Amendment right to free speech and as "punishment for his personality and philosophy." Brief of Plaintiff/Appellant at 12. He asserts that the court's written order failed to address his retaliation claim and made no findings thereon, that a retaliation claim involves factual questions as to defendants' state of mind, and that defendants' affidavits failed to rebut his allegations of retaliation. For all those reasons, Setliff asserts that summary judgment was inappropriate on his First Amendment retaliation claim.

With regard to his due process claim, Setliff argues that "[s]ince the hospital recognizes the necessity for cause to limit privileges and the right to a hearing, Plaintiff clearly has a property right requiring due process," *id.* at 16, and that, because he was never given notice of the exact complaints against him or granted a hearing while the 1983 Executive Committee was conducting its investigation, and because the investigating committee, as well as the Board of Trustees, was biased, he was denied due process. Finally, relying upon *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), he argues that, in addition to damaging his reputation, the Hospital's investigation effectively denied him the ability to practice his profession, thereby denying him a protected liberty interest without due process.

Setliff further argues that the district court erred in finding his state law defamation claims barred by the one year statute of limitations. He alleges that "the communications to the committee of Campbell County Hospital occured [sic] under circumstances where the Defendants knew that the comments would become a permanent part of Setliff's Campbell County personnel file and would be repeatedly republished." Brief of Plaintiff/Appellant at 23. Such republication, he argues, tolls the statute of limitations.

### · DISCUSSION

Our standard of review of a grant of summary judgment is well settled.

"When reviewing a grant of summary judgment, this court must examine the record to determine whether any genuine issue of material fact pertinent to the ruling remains and, if not, whether the substantive law was correctly applied. In determining whether any genuine issues of material fact exist, the record must be construed liberally in favor of

the party opposing the summary judgment. However, conclusory allegations by the party opposing summary judgment are not sufficient to establish an issue of fact and defeat the motion. Finally, we may affirm the granting of summary judgment if any proper ground exists to support the district court's ruling."

*McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir.1988) (citations omitted); *see also Dickeson v. Quarberg*, 844 F.2d 1435, 1437 n. 1 (10th Cir.1988). We address first Setliff's claim that the district court improperly granted summary judgment on his First Amendment claim.

## A. First Amendment Claim.

■ Setliff alleges that the Hospital's investigation of his medical practice and ultimate decision requiring him to obtain second opinions in certain situations amounted to retaliation for speech protected under the First Amendment. As indicated, however, to avoid summary judgment Setliff must make more than conclusory allegations regarding his First Amendment claim. The Supreme Court has recently indicated that:

"a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' ...

. . . .

"... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (quoting *First National Bank v. Arizona Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)) (citations omitted). Even viewed in a light most favorable to Setliff, the pleadings, affidavits and supporting materials do not provide "sufficient evidence favoring the nonmoving party [Setliff] for a jury to return a verdict for that party," *id.* at 249, 106 S.Ct. at 2511, on Setliff's retaliation claim. The record reveals nothing more than conclusory allegations; we therefore hold that summary judgment was proper on Setliff's First Amendment claim.

Setliff's complaint states as follows:

"Plaintiff is an outspoken individualist who has candidly expressed his opinions regarding the need for changes and improvements within Memorial Hospital of Sheridan County, as well as his strong concerns regarding serious issues of patient treatment. Plaintiff has advocated making improvements and changes in the nature of surgical care, including his strong insistence that hospital medical committees conduct a proper investigation into medical treatment received by a minor child whose condition became worse and died shortly after being transferred to another hospital."

Complaint ¶ 7, R. Vol. I, Doc. 1. His memorandum in opposition to defendants' motion for summary judgment alleged that "the entire proceeding was initiated, conducted and concluded with an intent to retaliate against the plaintiff for exercise of rights protected by the First Amendment, particularly the right to speech and to his individual personality and philosophy." R. Vol. II, Doc. 76 at 6–7. He further stated that "Defendants have not in any Memorandum, Brief or Affidavit submitted addressed Plaintiff's allegation of retaliation for the exercise of First Amendment rights. There is absolutely no basis whatsoever for the Court to grant a Motion for Summary Judgment on that theory." *Id.* at 8–9. Setliff's affidavits do not specifically address the retaliation claim, although his supplementary affidavit concedes that "[t]he charge made by Dr. Nickerson ... was the cause of the investigation leading to a reduction in my staff privileges." Supplementary Affidavit of Reuben C. Setliff, R. Vol. II, Doc. 75. Saunder's affidavit in support of defendants' motion for summary judgment states that "[t]he investigation was not undertaken as a method of retaliation against Dr. Setliff for the exercise of his free speech. The Committee was interested not in Setliff's speech patterns, but rather in his hospital practice." Saunders' Affidavit, R. Vol. I, Doc. 54. No other materials in

the record specifically bear upon the First Amendment issue.[11]

This court has stated that:

"[T]he plaintiff in a retaliation case .... must show that (1) the speech was constitutionally protected, i.e., the speech related to matters of public concern *and* the speaker's rights outweighed the state's right to control its employees, and (2) the speech was a substantial or the motivating factor in the state's detrimental action."

*Wren v. Spurlock,* 798 F.2d 1313, 1317 (10th Cir.1986) (emphasis in original), *cert. denied,* — U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987); *see also Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Saye v. St. Vrain Valley School District RE–1J,* 785 F.2d 862, 865–66 (10th Cir.1986). Even assuming, without deciding, that the investigation of Setliff amounted to prohibited "detrimental action" and that Setliff's speech was constitutionally protected, we hold that summary judgment was nonetheless appropriate.

Setliff's complaint merely alleges that he had urged changes and improvements at the hospital, voiced concerns relating to patient treatment, and sought an investigation of a child's death. Saunder's affidavit denied retaliation and Setliff presents no evidence or specific facts rebutting that affidavit. Indeed, as indicated, his affidavits in opposition to defendants' motion for summary judgment do not address the retaliation issue at all and his memorandum in opposition to defendants' motion for summary judgment makes the same gener-al allegation of retaliation contained in his complaint. The deposition of Townes, the chairman of the 1983 Committee, which Setliff attached to his affidavit, itself makes clear that the decision to investigate Setliff was based on complaints about his practice of medicine, not on anything he said. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *see also McKibben v. Chubb,* 840 F.2d 1525, 1532 (10th Cir.1988) ("When the party moving for summary judgment makes a showing that there is no evidence to establish an essential element of the claim, the burden then shifts to the party opposing the motion. That party must respond with evidence or citations to the record that dispute the motion for summary judgment."). Setliff would bear the burden at trial of proving that his speech was the substantial or motivating factor in the decision to investigate him. *See Saye v. St. Vrain Valley School District RE–1J,* 785 F.2d 862, 867 (10th Cir.1986). His pleadings, and his affidavits and other materials submitted in opposition to defendants' motion for summary judgment fail to identify any evidence suggesting a causal link between Setliff's speech and the investigation, nor does he explain why he is unable to do so. We require more than pure speculation to defeat a motion for summary judgment.[12]

**11.** In the hearing before the Campbell Hospital Judicial Review Committee, a copy of which is attached to one of Setliff's affidavits, Setliff detailed more specifically his statements regarding the improvement of the quality of care at Sheridan Hospital.

**12.** We note that in general summary judgment is "an inadequate procedure for sorting out nebulous questions of motivation." *Honore v. Douglas,* 833 F.2d 565, 569 (5th Cir.1987). Nonetheless, there is ample evidence suggesting that the defendants had reasons for investigating Setliff unrelated to Setliff's speech. By contrast, Setliff's only evidence suggesting retaliation based on his speech are his conclusory allegations of retaliation and the recitation of certain criticisms he directed at certain Hospital practices. That is insufficient to withstand a motion for summary judgment. *See Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985) ("[A]lthough summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indication of motive and intent supportive of his position."). *Cf. Conklin v. Lovely,* 834 F.2d 543, 547 (6th Cir.1987) (court held that there was sufficient evidence, albeit circumstantial, to create genuine fact issue of whether employee's dismissal was caused by her political activities where employee had "an exemplary

Summary judgment was accordingly properly granted to defendants on Setliff's First Amendment claim.[13] It was properly granted on Setliff's allegation of retaliation or "punishment" for his "personality and philosophy" for the same reason.

### B. Due Process Claim.

Setliff alleges that he was deprived of due process because he was never notified of the specific complaints against him during the investigation, because the investigating committee and the Board of Trustees was biased, and because there was an "unreasonable delay in granting and proceeding with a hearing." Brief of Plaintiff/Appellant at 15. Underlying this assertion is the claim that Setliff had a property or liberty interest entitled to due process. His argument with regard to his property right is as follows: "Since the

hospital recognizes the necessity for cause to limit privileges and the right to a hearing, Plaintiff clearly has a property right requiring due process." *Id.* at 16. Setliff's argument regarding his liberty interest is that he has such an interest in the practice of his profession and that the investigation effectively destroyed his ability to pursue his profession, thereby depriving him of a liberty interest without due process.

The district court granted defendants' motion for summary judgment, holding that Setliff failed to demonstrate the existence of a recognized property or liberty interest. We agree.[14]

■ To invoke the protections of procedural due process, a plaintiff must establish the existence of a recognized property or liberty interest. *Bd. of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33

---

employment record"); *Allen v. Scribner,* 812 F.2d 426, 434 (court held that there was a genuine issue of fact on whether the plaintiff's protected speech was a substantial factor in his transfer and harassment where affidavits of co-workers "suggest that his expressive activity motivated the transfer"), *modified,* 828 F.2d 1445 (9th Cir.1987).

**13.** Setliff asserts that the district court's order "demonstrates that the Court at no time addressed the issue of retaliation for exercise of free speech" and "made no findings of that issue." Brief of Plaintiff/Appellant at 14. He also asserts that "[n]o opposing affidavits were filed." *Id.* at 15. As indicated, we may affirm a grant of summary judgment on any proper grounds. *McKibben,* 840 F.2d at 1528. In addition, one of defendants' affidavits does address, albeit briefly, the retaliation claim. And the fact that the defendants did not argue the First Amendment issue in their motion for summary judgment is not necessarily fatal. "Even if a ground is not urged by a party, where the requirements of Rule 56 are met, the court is not barred from any consideration of that ground. It can grant summary judgment on grounds other than those raised in the motions before the court if the facts were fully developed showing entitlement of the nonmoving party to judgment as a matter of law, and if the court is satisfied there is no procedural prejudice to the moving party." *Wilder v. Prokop,* 846 F.2d 613, 626 (10th Cir.1988). Similarly, we see no reason why, absent prejudice to the nonmoving party, a properly supported motion for summary judgment cannot be granted on grounds not urged by the moving party. *See also Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (Supreme Court acknowledged courts' "power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.") In oral argument before the district court on defendants' motion for summary judgment, Setliff's attorney stated "[n]o Defendant has addressed that [the First Amendment claim]. There is no affidavits, there is nothing. ... There is no motions, no discovery, no nothing about that." R. Vol. II, Doc. 80 Tab E. By the time defendants' motion for summary judgment was argued, discovery had been conducted and the discovery cutoff date had apparently passed. Setliff demonstrates no reason why he could not have explored his retaliation claim more fully in discovery and elicited evidence supporting it. We accordingly see no prejudice to him in granting summary judgment to defendants on that issue.

**14.** At the outset, we note that we agree with defendants' argument that the issue of alleged bias on the part of the Board of Trustees, as distinct from the 1983 or 1984 Executive Committees, is not properly before this court. Setliff's complaint was filed prior to the hearing conducted by the Board, and accordingly made no mention of bias on the part of the Board. Setliff has never sought to amend his complaint to include such bias. In addition, as defendants point out, Setliff never argued the bias of the Board at the hearing on defendants' motion for summary judgment. Under such circumstances, that issue is not properly before this court.

L.Ed.2d 548 (1972); *Dickeson v. Quarberg,* 844 F.2d 1435 (10th Cir.1988). "[T]he range of interests protected by procedural due process is not infinite." *Roth,* 408 U.S. at 570, 92 S.Ct. at 2705. Courts must look to "existing rules or understandings that stem from an independent source such as state law" to define the dimensions of protected property interests. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709); *Dickeson,* 844 F.2d at 1437; *Koerpel v. Heckler,* 797 F.2d 858, 864 (10th Cir.1986). "The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982). Setliff argues that since the Hospital's By-laws, Rules and Regulations recognize "the necessity for cause to limit privileges and the right to a hearing," he has the requisite property interest. Defendants concede that Setliff's medical staff privileges are a property interest subject to due process protections. Setliff was provided with a hearing conducted in accordance with the Wyoming Administrative Procedure Act prior to the decision to require him to get a second opinion before

performing certain procedures. He was not provided with a hearing during the investigation, although he was offered the opportunity several times to appear before the investigating committee, but during the investigation his privileges were not restricted in any way. Accordingly, he suffered no unconstitutional deprivation of his medical privileges simply because he was not granted a hearing during the investigation.[15] *See Goulding v. Feinglass,* 811 F.2d 1099, 1102 (7th Cir.) ("The Supreme Court in *Paul v. Davis* makes clear that to find the deprivation of a property interest ... [plaintiff's] legal rights or status must have been removed or significantly altered."), *cert. denied,* —— U.S. ——, 107 S.Ct. 3215, 96 L.Ed.2d 701 (1987); *Steuer v. Nat. Med. Enterprises,* 672 F.Supp. 1489, 1525 (D.S.C.1987) ("[W]ithout ever considering whether plaintiff's medical staff privileges would constitute a protected right, it is clear that plaintiffs cannot prevail because they still enjoy the very rights on which the Section 1983 claim is based.")[16]

In sum, while Setliff may have a property interest in his medical privileges, the undisputed facts establish that those privileges were in no way restricted or modified until after he had received a hearing before the Board of Trustees. Thus, he was not deprived of any property right without due

15. Similarly, the Supreme Court has indicated that the full panoply of procedural due process rights do not attach to non-adjudicative governmental action. *Hannah v. Larche,* 363 U.S. 420, 442–43, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960) ("[W]hen governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.... [T]he investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings."); *see also SEC v. Jerry T. O'Brien, Inc.,* 467 U.S. 735, 742, 104 S.Ct. 2720, 2725, 81 L.Ed.2d 615 (1984) ("The Due Process Clause is not implicated under such circumstances because an administrative investigation adjudicates no legal rights...."); *SEC v. Meek,* Fed.Sec.L.Rep. (CCH) P97,323 (10th Cir.1980) (per curiam) ("when administrative agencies 'are conducting nonadjudicative, factfinding investigations, rights such as appraisal, confrontation, and cross-examination generally do not obtain.'") (quoting *Hannah,* 363 U.S. at 445–46, 80 S.Ct. at

1516). While Setliff vigorously argues that the investigation was actually an adjudication of his rights, in fact it is absolutely clear that the investigating bodies, the 1983 and 1984 Executive Committees, had no authority to render any final decision regarding Setliff and did not attempt to do so. That authority rested with the Board of Trustees, who granted Setliff a full hearing prior to issuing their decision. And as we have indicated, any claim that the hearing itself failed to comport with due process is not properly before this court.

16. Similarly, as the district court held, Setliff had no protected right to be free from an investigation by Sheridan Hospital. Setliff directs us to no "existing rules or understandings" stemming from any source which provide him with a right not to be investigated. Indeed, defendants point out several Wyoming statutory provisions designed to encourage hospital committees to review and investigate the medical practice of staff doctors. *See* Wyo.Stat. §§ 35–2–601 to 604, §§ 35–17–101 to 106.

process.[17]

■ We turn now to Setliff's claimed deprivation of a liberty interest in the practice of his profession, by virtue of the investigation which, Setliff argues, injured his reputation and effectively foreclosed other employment opportunities. The district court held that Setliff failed to establish the existence of a recognizable liberty interest, stating:

"No sanctions were imposed on him during the investigation. The investigation by itself did not cause any change of status, but certainly none sufficient to implicate any recognizable liberty interest. That he may have been subjected to close scrutiny by the public and perhaps was deprived of some patients due to rumors, like the plaintiff in *Elbaor [v. Grand Prairie Hospital Authority*, 599 F.Supp. 1111 (N.D.Tex.1984)] is really speculation and it does not deprive him of any liberty interest."

R. Vol. II, Doc. 80 at 4. We agree with the district court.

"The liberty interest that due process protects includes the individual's freedom to earn a living." *Lentsch v. Marshall*, 741 F.2d 301, 303 (10th Cir.1984). However, as the Supreme Court has stated, injury to one's "reputation alone, apart from some more tangible interests such as employment," is not subject to the requirements of due process. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed. 2d 405 (1976); *Koerpel v. Heckler*, 797 F.2d 858, 865 (10th Cir.1986); *Corbitt v. Andersen*, 778 F.2d 1471, 1474 (10th Cir.1985); *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir.1981). Our cases recognize that the "more tangible interests" involve something more than an investigation of the sort conducted by the Hospital in this case. *See Dickeson v. Quarberg*, 844 F.2d 1435 (10th Cir.1988) (plaintiffs' employment terminated); *Harris v. Blake*, 798 F.2d 419 (10th Cir.1986) (plaintiff required to withdraw from graduate study program), *cert. denied*, — U.S. —, 107 S.Ct. 882, 93

L.Ed.2d 836 (1987); *Koerpel v. Heckler*, 797 F.2d 858 (10th Cir.1986) (plaintiff excluded from eligibility for Medicaid reimbursements); *Mangels v. Pena*, 789 F.2d 836 (10th Cir.1986) (plaintiffs' employment terminated); *Bailey v. Kirk*, 777 F.2d 567 (10th Cir.1985) (plaintiff suspended without pay and demoted); *Asbill v. Housing Auth. of Choctaw Nation*, 726 F.2d 1499 (10th Cir.1984) (plaintiff discharged); *Walker v. United States*, 744 F.2d 67 (10th Cir.1984) (plaintiff's employment terminated).

As indicated, Setliff's employment status was never altered during the investigation which he alleges harmed his reputation. His medical staff privileges were not modified or restricted in any way. And while the Board of Trustees ultimately decided that Setliff would have to obtain second opinions in certain circumstances, arguably a modification of his staff privileges which may indeed have a negative effect on his professional reputation, he was provided with a hearing prior to that decision. Setliff's allegation that the investigation caused him to be less attractive to other employers, and perhaps to patients, without more, is insufficient to establish the existence of a liberty interest. As this court has recognized, "circumstances which make an employee 'somewhat less attractive' to employers would hardly establish the kind of 'foreclosure of opportunities amounting to a deprivation of liberty.'" *Asbill* 726 F.2d at 1503 (quoting *Roth*, 408 U.S. at 574 n. 13, 92 S.Ct. at 2707 n. 13); *see also Goulding v. Feinglass*, 811 F.2d 1099, 1103 (7th Cir.) ("The investigations and alleged comments may very well have made him less attractive to clients, but this Court stated in *Perry v. Federal Bureau of Investigation*, 781 F.2d 1294, 1302 (7th Cir.1986): '[a] liberty interest is not implicated merely by a reduction in an individual's attractiveness to potential employers.' There is no legal barrier to Goulding pursuing his practice of law.") (footnote omitted), *cert. denied*, — U.S. —, 107 S.Ct. 3215, 96 L.Ed.2d 701 (1987); *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir.1985) ("Liberty is

---

17. As indicated, the adequacy of the hearing before the Board of Trustees is not an issue before this court. *See supra* note 14.

not infringed by a label of incompetence or a failure to meet a specific level of management skills, which would only affect one's professional life and force one down a few notches in the professional hierarchy. A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment.") (citations omitted); *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir.1976) ("All the charges which surround his termination center around his inability to perform satisfactorily as a pathology resident, including an unwillingness or inability to deal with his coworkers in a professional manner. These are not the kind of charges which are likely to preclude Dr. Stretten from practicing medicine, and in fact there is evidence in the record that the charges may not have precluded him from staying in his specialty of pathology.") (footnote omitted).

Thus, absent some "change of [Setliff's] status as theretofore recognized under the State's laws," *Paul*, 424 U.S. at 712, 96 S.Ct. at 1168, Setliff has not been deprived of a liberty interest, despite the fact that his reputation and his attractiveness to other employers may have been diminished.[18]

C. State Law Claims.

We turn finally to Setliff's state law claims against various defendants. The district court dismissed Setliff's second and third claims, alleging negligence and abuse of the peer review system, on the ground that it had no jurisdiction over such pendent state law claims once Setliff's federal claims were dismissed. We affirm the district court's exercise of discretion in that regard. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Gunkel v. Emporia*, 835 F.2d 1302, 1305 (10th Cir. 1987); *Curtis Ambulance v. Bd. of Cty. Comm'rs.*, 811 F.2d 1371, 1386–87 (10th Cir.1987). The district court dismissed Setliff's defamation claims against defendants Saunders and Wohl on the ground that they were barred by Wyoming's one year statute of limitations applicable to actions for libel or slander. We affirm that decision as well.

Setliff's defamation claims against Wohl and Saunders arise out of allegedly defamatory statements made to Hobson, the Campbell Hospital physician, in the fall of 1982. Setliff learned of the statements in September 1983. His action was brought in December 1984. Setliff does not dispute that Wyoming has a one year statute of limitations applicable to actions for libel or slander. Wyo.Stat. § 1–3–105(a)(v)(A). Accordingly, absent some tolling or other reason why the statute of limitations would not commence to run from the time the statements were made or, at the latest, from the time he learned of the statements, Setliff's defamation claims were barred by the statute.[19]

Setliff argues that the allegedly defamatory communications "to the committee of Campbell County Hospital occured [sic] under circumstances where the Defendants

---

**18.** Setliff argues that this court's decision in *Corbitt v. Andersen*, 778 F.2d 1471 (10th Cir. 1985) mandates a different result. Defendants concede that *Corbitt* supports Setliff's contentions in this case and urge us to overrule it as an "aberrant decision." *Corbitt* is distinguishable from this case. In *Corbitt*, the plaintiff, Corbitt, a psychologist, sued another psychologist who, as the director of a nonprofit corporation funded by state and county funds, allegedly made defamatory statements regarding Corbitt, which statements caused client referrals from two state agencies to cease. A majority of a panel of this court held that Corbitt had made out a *prima facie* case that his liberty interest had been violated, stating that "Andersen not only defamed Corbitt, but created a stigma that 'foreclosed his freedom to take advantage of other employment opportunities.' … The jury heard sufficient evidence regarding the initial health and worth of Corbitt's private practice and could reasonably conclude that Andersen's actions weakened and devalued it." *Corbitt*, 778 F.2d at 1475. Corbitt, in contrast to Setliff, had an existing practice composed, at least in part, of referrals from two agencies, which the allegedly defamatory statements caused to stop. While we view *Corbitt* as perhaps extending the concept of a liberty interest to its maximum permissible limit, it is not inconsistent with our decision in this case because Corbitt's ongoing practice based on referrals constituted a more "tangible interest" than Setliff's prospective employment possibilities at any other hospital.

**19.** The parties disagree, as they did before the district court, on whether, under Wyoming law, the statute of limitations for libel or slander

knew that the comments would become a permanent part of Setliff's Campbell County personnel file and could be repeatedly republished." Brief of Plaintiff/Appellant at 23. He argues that such "republication" occurred as late as January 3, 1984, when the Campbell Hospital Board of Trustees reviewed Setliff's personnel file, and thus his action was brought within one year. We disagree.

Setliff concedes that no Wyoming case law supports his republication theory. More fundamentally, however, we find no evidence in the record specifically supporting such a theory. Setliff "contends that those statements were republished when reviewed by Hospital Board members at a later date. The Campbell County record demonstrates that the defamatory statements were included within specific documents reviewed January 3, 1984 by the Board of Trustees of Campbell County Memorial Hospital." *Id.* The "Decision of Governing Body Concerning Dr. Reuben C. Setliff III Courtesy Medical Staff Privileges," included in the record on appeal, refers to a meeting of the Board of Trustees of Campbell Hospital on January 3, 1984, in which the Board considered "the written application of Dr. Setliff, ... consisting of Page M–H–1 through M–H–301; personnel file of Dr. Setliff from the Sheridan County Memorial Hospital, consisting of documents numbered 1 through 76; transcript of procedures held before Judicial Review Committee ..., copies of ten letters to various persons requesting further information on Dr. Setliff; eight replies thereto...." R. Vol. II Doc. 76. No specific reference is made to the allegedly defamatory statements nor to the manner in which they were "republished." While

Setliff wishes us to infer such republication by virtue of the fact that allegedly defamatory material was in his personnel files at Sheridan Hospital and Campbell Hospital, and possibly was discussed at the January 3 meeting of the Board of Trustees of Campbell Hospital, in the absence of more specific evidence, we refuse to find any republication which tolls the statute of limitations. Mere speculation is insufficient to defeat summary judgment. We therefore affirm the dismissal of Setliff's defamation claims against Saunders and Wohl.[20]

## CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court granting summary judgment to defendants and dismissing Setliff's claims.

---

commences to run on the date the allegedly defamatory statements are made or the date when the plaintiff learns of them. We need not address that issue, for even assuming that the statute does not commence to run until Setliff learned of the statements in September 1983, his action is still barred, unless the statute is tolled, because he brought it more than one year after that date.

**20.** In addition, defendants argue that the release executed by Setliff in connection with his application to Campbell Hospital bars his defamation claims against Saunders and Wohl. While we

do not address the validity of the release or assume that every such release is valid in every circumstance, we note that the release was clearly intended to encourage the very kind of frank and honest personal evaluation of the applicant as occurred in this case, and that it served a worthwhile purpose in doing so. Further, Saunders and Wohl argue that they relied upon the validity of the release in expressing their views to Campbell Hospital personnel. In such circumstances, we would not necessarily assume, as Setliff urges us to, that the release he signed is invalid.